**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1915**

MARIA DEL CARMEN AMAYA-DE SICARAN,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Submitted: September 11, 2020                    Decided: October 30, 2020

Before WILKINSON, NIEMEYER, and DIAZ, Circuit Judges.

Petition dismissed in part and denied in part by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Diaz joined.

Ronald D. Richey, LAW OFFICE OF RONALD D. RICHEY, Rockville, Maryland, for Petitioner. Joseph H. Hunt, Assistant Attorney General, Carl H. McIntyre, Assistant Director, Benjamin J. Zeitlin, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

WILKINSON, Circuit Judge:

Maria Del Carmen Amaya-De Sicaran (Sicaran), a native and citizen of El Salvador, applied for asylum, statutory withholding of removal, and protection under the Convention Against Torture (CAT). An immigration judge (IJ) and the Board of Immigration Appeals (BIA or Board) denied her application, and she now petitions for review. For the reasons that follow, we dismiss the petition in part for want of jurisdiction and we deny the petition on the remaining grounds.

I.

Sicaran entered the United States unlawfully in August 2013. The Department of Homeland Security subsequently charged her as removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA) for not possessing valid entry documents at the time she sought admission to the United States. Sicaran conceded through counsel that she did not possess valid entry documents and was therefore eligible for removal. To avoid removal, Sicaran applied for asylum, 8 U.S.C. § 1158, statutory withholding of removal, 8 U.S.C. § 1231(b)(3), and withholding of removal under the Convention Against Torture, 8 C.F.R. §§ 1208.16, 1208.18.

Sicaran claimed asylum and withholding of removal on the grounds that she suffered persecution as a member of a "particular social group." 8 U.S.C. §§ 1231(b)(3)(A), 1158(b)(1)(A) (referencing § 1101(a)(42)(A)). Before the IJ and BIA, she defined her proposed group as "married El Salvadoran women in a controlling and abusive

2

domestic relationship." A.R. 3, 154[1]; *see* 8 U.S.C. § 1101(a)(42)(A). More specifically, Sicaran feared her husband, German Ernesto Sigaran Luna (Luna), would harm her if she were removed to El Salvador. Her application and testimony before the Immigration Judge detailed abuse she suffered at the hands of Luna, who is a soldier in the Salvadoran Army and with whom she has had four children. According to the record, Sicaran and Luna's relationship began in 1996, and the two married in 2000. Her husband began abusing her— including beating and raping her—around 1998. These attacks sometimes occurred in front of their children.

As the IJ noted, the record is unclear as to whether Sicaran and Luna ever divorced, but at a minimum, the two stopped living together in 2009 after entering into a custody agreement. Before they separated, Luna took one of their daughters from Sicaran. The police subsequently returned the girl to Sicaran and "warn[ed] [Luna] to leave [Sicaran] alone." A.R. 664 (Sicaran's affidavit). In 2012, however, Sicaran claimed that Luna again attempted to take their daughter from her mother's house while wielding a machete. Sicaran testified that she wanted to file a complaint with the police but feared doing so because she knew Luna was watching her. Luna attempted once more to take two of their children while they were at church a few weeks later. Before the police were called, other churchgoers interceded.

---

[1] Citations to the "A.R." refer to the Administrative Record filed by the parties in this appeal.

Yet again, in 2012, Sicaran claimed that her cousins fended off Luna when he attempted to attack Sicaran at a party. One cousin was injured, and Luna fled after the police arrived at the scene. Both the cousins and Luna filed a complaint with the police, each blaming the other for the incident. Sicaran testified that she later heard that soldiers beat her cousins due to their involvement, but the testimony of another witness noted that soldiers questioned the cousin about the altercation while he was in the hospital. Ultimately, no legal action was taken against Luna in connection with the incident. Sicaran moved elsewhere in El Salvador in late 2012, and while her husband continued to follow her, she reported no physical altercations. She then travelled to the United States in 2013.

After Sicaran's removal proceedings commenced, she filed her applications for relief from removal. The IJ denied Sicaran's applications for asylum, statutory withholding of removal, and CAT protection in July 2017. The IJ found that Sicaran filed her applications properly, testified credibly, and adequately corroborated her claims. Nevertheless, the IJ denied her claims on the merits. First, the IJ held that while the group claimed by Sicaran—"married El Salvadoran women in a controlling and abusive domestic relationship"—did qualify as a particular social group under the INA, she had since left that group in 2009 when she entered into a custody agreement with her husband. A.R. 58–59. Thus, she did not qualify for asylum or statutory withholding of removal. Second, as to her CAT claim, the IJ found that Sicaran failed to show a clear probability of being tortured by the El Salvadoran government or that the government would acquiesce in her torture, as is required under the governing regulations.

4

Sicaran filed a timely appeal to the Board of Immigration Appeals in August 2017, which dismissed her appeal in a single-member decision in July 2018. Reviewing her claim *de novo*, the Board found that Sicaran's claimed social group was not cognizable under the INA in light of the Attorney General's decision in *Matter of A-B-*. A.R. 4 (citing 27 I. & N. Dec. 316 (A.G. 2018)). Namely, "married El Salvadoran women in a controlling and abusive domestic relationship" did not "exist independently of the harm asserted"; rather, the group was defined in terms of the very persecution alleged. *Id.* Second, as a further ground, the Board held that the putative group was not cognizable because being in a domestic relationship was not immutable, as demonstrated by Sicaran's ability to separate from her husband in 2009. *Id.* Third, the Board affirmed the IJ's CAT decision that Sicaran failed to shoulder her evidentiary burden, in particular because she failed to establish governmental acquiescence in her alleged torture. *Id.* This appeal timely followed.

II.

Sicaran argues that the BIA erred in its application of *Matter of A-B-*, erred in finding her proposed particular social group non-cognizable, and ultimately erred in denying her applications for asylum, statutory withholding of removal, and CAT protection. She also raises several new social groups for the first time on this appeal.

We uphold the BIA's denial of asylum unless it is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). Whether a proposed particular social group is cognizable is ultimately a legal determination that we review *de novo*. *Temu v. Holder*, 740 F.3d 887, 898 (4th Cir. 2014). As to the Board's factual findings, we uphold them "unless no rational factfinder could reach the same conclusion." *Id.* at 891; *see* 8

5

U.S.C. § 1252(b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (noting that the agency's determination must be upheld if it is "supported by reasonable, substantial, and probative evidence").

The INA permits the Attorney General to grant asylum to an applicant who establishes that she "is a refugee within the meaning of section 1101(a)(42)(A)" of the INA. 8 U.S.C. §§ 1158(b)(1)(A), (B)(i).  To qualify as a "refugee," an applicant must establish that she "is unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, [her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).

It is settled that an applicant claiming membership in a "particular social group" must establish that the group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."  *Alvarez Lagos v. Barr*, 927 F.3d 236, 252 (4th Cir. 2019) (internal quotation marks and citation omitted).  Further, the applicant's proffered particular social group "*must* 'exist independently' of the harm asserted in an application for asylum or statutory withholding of removal."  *Matter of A-B-*, 27 I. & N. Dec. 316, 334 (A.G. 2018) (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 236 n.11 (BIA 2014)).  This requirement—commonly known as the anti-circularity requirement—ensures that the applicant separately establishes that she suffered—or has a credible fear of suffering in the future—persecution "on account of" her membership in the particular social group.  *See*

6

*id*. at 338 (labeling the statute's requirement that the persecution be "on account of" membership in a group the "nexus requirement").

## A.

We first address the numerous particular social groups that Sicaran raises for the first time on appeal. Her doing so creates a problem of jurisdiction.

In order for a court to review a final order of removal, the INA requires an applicant to exhaust "all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). Moreover, the applicant bears the burden of raising *all* particular social groups and specifying "the exact delineation of any particular social group(s) to which she claims to belong" on the record before the immigration judge in the first instance. *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 191 (BIA 2018) (quoting *Matter of A-T-*, 25 I. & N. Dec. 4, 10 (BIA 2009)). Applicants often raise multiple, alternative grounds before the IJ to guard against the possibility that one is non-cognizable. *E.g.*, *Alvarez Lagos*, 927 F.3d at 245–46.

In her application before the IJ and BIA, Sicaran only delineated "married El Salvadoran women in a controlling and abusive domestic relationship" as her potential particular social group. A.R. 4, 154. The other groups—"women who have familial relationships with their abusive ex-partners"; "an El Salvadoran woman fleeing an abusive and controlling male relationship that she cannot leave"; "a female El Salvadoran who is part of a family and is persecuted because of her familial ties to her children"; "a female El Salvadoran who was previously married to a member of the Salvadoran Army, shares children with him, and has been threatened and abused by him;" and "her family,"

7

Petitioner Br. at 14, 16, 22—were raised for the first time before this court. They are therefore unexhausted claims and we simply lack jurisdiction to consider them.

The exhaustion requirement is an important "jurisdictional bar" that both promotes judicial efficiency and protects the integrity of the administrative process by ensuring that the courts of appeal do not usurp the administrative function and render a decision on a ground that the agency never considered. *Massis v. Mukasey,* 549 F.3d 631, 638–39 (4th Cir. 2008); *see also Lizama v. Holder*, 629 F.3d 440, 448 (4th Cir. 2011). A particular social group raised for the first time on appeal presents a moving target for appellate courts that then cannot rely on the expertise of the immigration judge in its fact-finding capacity. *See Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1102 (9th Cir. 2020) (Bress, J., concurring in the judgment in part and dissenting in part) ("Requiring the petitioner to delineate her proposed social groups has important practical benefits . . . . It ensures that appropriate fact-finding is conducted at the IJ level."); *see also Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. at 191–92.

This is hardly a new requirement. By only considering the group Sicaran raised before the IJ, we mirror our prior practice, *Aguilar-Avila v. Barr*, 782 F. App'x. 256, 261 (4th Cir. 2019), and align ourselves with a broad array of our sister circuits that similarly acknowledge the jurisdictional bar erected by newly raised groups. *See, e.g.*, *Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 n.1 (1st Cir. 2018); *Hernandez-De La Cruz v. Lynch*, 819 F.3d 784, 786 (5th Cir. 2016); *Duarte-Salagosa v. Holder*, 775 F.3d 841, 845 (7th Cir. 2014); *Baltti v. Sessions*, 878 F.3d 240, 244–45 (8th Cir. 2017); *Diaz-Reynoso*, 968 F.3d at 1102 (Bress, J., concurring in the judgment in part and dissenting in part)

(collecting cases of the Ninth Circuit "repeatedly determin[ing] that [it] lack[s] jurisdiction to consider a new or different proposed social group that the petitioner did not present to the agency"); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 647 n.2 (10th Cir. 2012); *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 796, 802–03 (11th Cir. 2016). Thus, petitioner's faulting the Board for "limiting" her to a single social group, Petitioner Br. at 16—when she bore the burden of explicitly delineating all groups to the IJ, *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. at 191—is misplaced and we lack jurisdiction to consider the numerous new groups not presented to the agency.

B.

We therefore consider only the particular social group that Sicaran raised before the IJ and BIA—"married El Salvadoran women in a controlling and abusive domestic relationship." *See* 8 U.S.C. § 1252(a)(1). The BIA dismissed petitioner's appeal because her proposed group was circular: "being in a controlling and abusive domestic relationship is a characteristic that defines the group by the fact of persecution." A.R. 4 (citing *Matter of A-B-*, 27 I. & N. Dec. at 334). Thus, Sicaran's proposed "social group does not 'exist independently of the harm asserted,' as required for a group to be a cognizable particular social group." *Id.*

In arriving at this conclusion, the BIA relied in large part on the Attorney General's decision *Matter of A-B-*. The BIA in *A-B-* had reversed the IJ's denial of the applicant's claims, finding that A-B-'s proffered particular social group—"El Salvadoran women who are unable to leave their domestic relationship where they have children in common"— was cognizable as it was "substantially similar" to the group previously recognized by the

9

BIA in *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014)—"married women in Guatemala who are unable to leave their relationship." *Matter of A-B-*, 27 I. & N. Dec. at 319–21. After the IJ considered the issue again and returned the matter to the Board, the Attorney General certified the case to himself for review. *Id.* at 323.[2]

As is pertinent to the instant case, the Attorney General in *Matter of A-B-* reaffirmed the importance of the anti-circularity requirement in assessing whether a particular social group is cognizable. *Id.* at 319. In critiquing *A-R-C-G-*, the Attorney General faulted the BIA for, *inter alia*, its reliance on the Department of Homeland Security's "multiple concessions" and its "cursory analysis of the three factors required to establish a particular social group," which "lacked rigor and broke with the Board's own precedents." *Id.* at 331–33. Namely, by relying on DHS's concession that the particular social group was "both particular and socially distinct," the Board "avoided considering whether A-R-C-G- could establish the existence of a cognizable particular social group without defining the group by the fact of persecution." *Id.* at 334. The Attorney General explained that "a particular social group *must* 'exist independently' of the harm asserted in an application for asylum or statutory withholding of removal." *Id.* Otherwise, "the definition of the group moots the need to establish actual persecution." *Id.* at 335 (citing *Rreshpja v.*

---

[2] We pause briefly here to note that petitioner's contention that the Attorney General lacked jurisdiction to certify *Matter of A-B-* to himself is without merit. The INA vests the Attorney General with broad powers over immigration cases, and the governing regulations authorize the Attorney General to review "all cases . . . [t]he Attorney General directs the Board to refer to him." 8 C.F.R. § 1003.1(h)(1)(i); *see also Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 279 (4th Cir. 2004).

*Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005) ("The individuals in the group must share a narrowing characteristic other than their risk of being persecuted.")).

The Attorney General, and his delegate, the BIA, are entitled to deference in reasonably interpreting ambiguous provisions of the INA. *Negusie v. Holder*, 555 U.S. 511, 516–17 (2009); *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). Neither the INA nor its implementing regulations define "particular social group," and it is well-established that the phrase is ambiguous. *See, e.g.*, *Canales-Rivera v. Barr*, 948 F.3d 649, 657 & n.4 (4th Cir. 2020) (citing *Lizama v. Holder*, 629 F.3d 440, 446–47 (4th Cir. 2011) ("[W]e have acknowledged that we must defer to the BIA's reasonable interpretation of 'particular social group.'"); *Paloka v. Holder*, 762 F.3d 191, 195 (2d Cir. 2014); *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1087 (9th Cir. 2013); *Amezcua-Preciado v. U.S. Att'y Gen.*, 943 F.3d 1337, 1341 (11th Cir. 2019); *see also* *Matter of A-B-*, 27 I. & N. Dec. at 327 n.6 (collecting cases). Moreover, Congress has explicitly charged the Attorney General with interpreting and administering the INA. 8 U.S.C. § 1103(a)(1); *see also* 8 C.F.R. § 1003.1(g)(1). This reaffirms the executive branch's well-settled role in immigration law. "Judicial deference in the immigration context is of special importance, for executive officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *Negusie*, 555 U.S. at 517 (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)).

The proposition that a cognizable particular social group cannot be defined by the underlying persecution is hardly controversial. The anti-circularity principle—and the *Chevron* deference to which it is entitled—has won wide acceptance among the circuit

11

courts. *See, e.g.*, *Gonzales-Veliz v. Barr*, 968 F.3d 219, 227–29 (5th Cir. 2019) (holding that "*A-B-* was not arbitrary and capricious"); *Diaz-Reynoso*, 968 F.3d at 1079 (upholding *Matter of A-B-* under *Chevron*); *Amezcua-Preciado*, 943 F.3d at 1343–44.

Even prior to the Attorney General's decision, we have applied the anti-circularity principle. *Moreno v. Lynch*, 628 F. App'x 862, 865 (4th Cir. 2015). And a broader examination of caselaw pre-*Matter of A-B-* confirms that this is no new proposition. *See, e.g.*, *Perez-Rabanales v. Sessions*, 881 F.3d 61, 67 (1st Cir. 2018) ("A sufficiently distinct social group must exist independent of the persecution claimed to have been suffered by the alien and must have existed before the alleged persecution began."); *Gonzalez-Posadas v. Att'y Gen. U.S.*, 781 F.3d 677, 683–84 (3d Cir. 2015); *Paloka*, 762 F.3d at 196; *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013); *Rreshpja*, 420 F.3d at 556; *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003).

The Attorney General's ruling in *Matter of A-B-* is not arbitrary and capricious. The anti-circularity requirement is necessary to make real the statute's separate nexus requirement—an asylum applicant must demonstrate that she has suffered persecution, or fears future persecution, "*on account of*" her membership in the proposed particular social group. 8 U.S.C. § 1101(a)(42)(A); *see also Rreshpja*, 420 F.3d at 556; *Matter of A-B-*, 27 I. & N. Dec. at 338 ("[The nexus] requirement is where the rubber meets the road because the importance of the 'on account of' language must not be overlooked." (internal quotation marks and citations omitted)). If the harm is baked into the definition of the particular social group, this nexus requirement is nullified. The words "on account of" or "because of" would be rendered superfluous.

12

Our reading of *A-B-* is in good company. Other circuits have similarly applied *A-B-* and found that a group defined by the claimed persecution is impermissibly circular. *See, e.g.*, *Gonzales-Veliz*, 928 F.3d at 232 ("'Honduran women unable to leave their relationship' is impermissibly defined in a circular manner."); *Amezcua-Preciado*, 943 F.3d at 1345 ("Mexican women who are unable to leave their domestic relationships . . . is the kind of circular definition of a social group, created by reference to the alleged persecution, that cannot create a cognizable particular social group."); *Perez-Zeneto v. U.S. Att'y Gen.*, 913 F.3d 1301, 1309–10 (11th Cir. 2019) ("Mexican citizens targeted by criminal groups because they have been in the United States and have families in the United States . . . is defined in large measure by the risk of persecution."); *see also Matter of C-A-*, 23 I. & N. Dec. 951, 960 (BIA 2006) ("[T]he social group category was not meant to be a 'catch-all' applicable to all persons fearing persecution." (quoting UNHCR, Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, U.N. Doc. HCR/GIP/02/02, at ¶ 2 (May 7, 2002))).

With the scope of *A-B-* clearly defined, it is apparent that Sicaran's proposed social group runs afoul of the anti-circularity requirement. Indeed, Sicaran's proffered group— "married El Salvadoran women in a controlling and abusive domestic relationship"—is a clear example of impermissibly defining the group by the underlying persecution. We do not for a moment make light of any asylum applicant's circumstances. And if Congress wishes to broaden the bases for asylum, it is always free to do so. But the issue is not the gravity of petitioner's circumstances, but rather that the abuse Sicaran seeks to escape via

13

asylum protection defines her claimed group. The words "controlling" and "abusive" cannot be understood in any way other than harm. And Sicaran's testimony made clear that she sought to flee no other persecutorial acts than those of her husband. As we note above, if her group is defined by the abuse she suffered in her relationship, the nexus requirement is unacceptably reduced to a mere tautology. *See* 8 U.S.C. § 1101(a)(42)(A). To recognize the proposed particular social group as cognizable would be to undermine the core requirement of *Matter of A-B-*, which we have no power to do. We must therefore deny the petition for review on her asylum claim.[3]

### III.

Sicaran's claims for statutory withholding of removal, 8 U.S.C. § 1231(b)(3), and withholding of removal under the Convention Against Torture, 8 C.F.R. §§ 1208.16(c), 1208.18, also fail.

An applicant for withholding of removal must show that, if she were removed, it is more likely than not that her "life or freedom would be threatened . . . because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). A successful application for withholding of removal *prohibits* the Attorney General from removing the applicant from the United States; thus, such mandatory relief requires a higher evidentiary burden than the discretionary relief granted

---

[3] Because we find that Sicaran's proposed particular social group is non-cognizable on the grounds that it is impermissibly circular, it is unnecessary for us to analyze the Board's finding regarding immutability.

14

the Attorney General under the asylum statute. *See Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). Accordingly, because Sicaran's asylum claim fails, her claim for statutory withholding of removal must also fail under the heightened standard. *Zelaya v. Holder*, 668 F.3d 159, 167 (4th Cir. 2012).

CAT, under its implementing regulations, similarly "prohibits the United States from returning any person to a country where the person has demonstrated that it is more likely than not that he will be tortured if returned to such country." *Id.* at 161. In reviewing the BIA's decision, we find that Sicaran does not meet her burden in establishing it is "more likely than not that [she] would be tortured" upon return to El Salvador. 8 C.F.R. § 1208.16(c)(2).

First, "torture" has a well-defined meaning and not every instance of violence will qualify. *See* 8 C.F.R. § 1208.18(a)(1). And second, even if this violence satisfied the high bar of "torture," Sicaran also must demonstrate that the El Salvadoran government, or some other person acting in an official capacity, consented or acquiesced in the acts. *Id.* But the record demonstrates that Sicaran's suffering arose from personal domestic strife. Moreover, the simple fact that Sicaran's husband is a member of the military does not automatically render the government complicit. Rather, as the IJ properly noted, Sicaran's "own testimony is the police came at least once," and she also "took advantage of the court system in El Salvador, [as she] was able to work out a separation agreement with child support and visitation rights." A.R. 59; *see also* A.R. 132–33. Domestic abuse exists on a distressingly large scale in almost every country, but the government's difficulty in eliminating this scourge does not equate to condoning it. *See Andrade-Garcia v. Lynch*,

15

828 F.3d 829, 836 (9th Cir. 2016) ("[A] general ineffectiveness on the government's part to investigate and prevent crime will not suffice to show acquiescence."). To hold otherwise would impermissibly broaden the Convention Against Torture.

## IV.

Domestic abuse is deeply troubling. But Congress and the Attorney General have set parameters that we must follow. Our rulings follow a well-plowed path and align us with our sister circuits. For the foregoing reasons, we dismiss the petition in part and deny the petition in part.

*PETITION DISMISSED IN PART AND DENIED IN PART*