FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILBER AGUSTIN ACEVEDO GRANADOS, AKA Wilber Acevedo, AKA Wilbert Acevedo, AKA Wilbur Acevedo, *Petitioner*, | No. 19-72381 Agency No. A213-018-914 |
| v. | OPINION |
| MERRICK B. GARLAND, Attorney General, *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted October 22, 2020
San Francisco, California

Filed March 24, 2021

Before: Richard R. Clifton, N. Randy Smith, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge Clifton

**SUMMARY**[*]

**Immigration**

The panel granted in part and denied in part Wilber Agustin Acevedo Granados's petition for review of the Board of Immigration Appeals' decision affirming an Immigration Judge's denial of asylum, withholding of removal, and protection under the Convention Against Torture, and remanded, holding that the Board erred in misunderstanding Acevedo's proposed social group based on his intellectual disability for purposes of asylum and withholding relief, and that substantial evidence supported the denial of CAT protection.

The Board held that Acevedo's proposed social group comprised of "El Salvadoran men with intellectual disabilities who exhibit erratic behavior" was not cognizable because it lacked particularity and social distinction. The panel concluded that the agency misunderstood Acevedo's proposed social group, explaining that the Board and IJ treated the term "intellectual disability" as if it were applied by a layperson, instead of recognizing that the term as used in Acevedo's application referred to an explicit medical diagnosis with several specific characteristics. The panel wrote that recognized that way, the clinical term "intellectual disability" may satisfy the "particularity" and "social distinction" requirements necessary to qualify for asylum and withholding of removal. However, because the IJ did not recognize the proposed social group before her, the panel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

remanded to the agency for fact-finding on an open record to determine if the group was cognizable.

As to the particularity determination, the panel held that the Board and IJ erred by assuming that a determination of mental illness was a subjective one, to be carried out by a judge. The panel wrote that the particularity standard does not expect that IJs make independent diagnoses based on their observations in the courtroom. The panel noted that the record in this case contained professional evaluations conducted by recognized psychologists, retained by the government, who reported their findings in professional terms, and diagnosed Acevedo with an intellectual disability. The panel wrote that like finders of fact generally, the IJ was not required to accede to these expert opinions, but she was not entitled to disregard the terms of the psychologists' diagnoses. The panel wrote that the fact that the average layperson may not be able to accurately identify an individual with an "intellectual disability" does not make the clinical definition subjective or amorphous, and that similarly, the possibility that individuals within the group may have sub-diagnoses or concurrent diagnoses does not make the group overbroad.

As to the social distinction analysis, the panel concluded that the Board's decision was flawed in two ways. First, the panel held that the Board erred in concluding that Acevedo's proposed group did not meet the social distinction requirement because the record did not support the determination that El Salvadoran society in general perceives the group to be a meaningful social unit, distinct from the larger population of mentally ill individuals. The panel explained that the social distinction inquiry asks whether the society in general perceives, considers, or recognizes persons

sharing the particular characteristic to be a group, not whether the group is sufficiently distinguishable from other, similarly-persecuted groups, or whether the individual is a part of one group to the exclusion of other groups. The panel wrote that the possibility that individuals with intellectual disabilities are subsumed in a larger group of persecuted individuals with mental illnesses does not control the social distinction analysis, because the question is whether individuals with intellectual disabilities are singled out for greater persecution than the general population.

Second, the panel held that the Board erred in concluding that evidence of discrimination or harassment of individuals exhibiting outward symptoms or behavioral manifestations of physical or mental illnesses was insufficient to establish social distinction. The panel wrote that if individuals are treated badly because they manifest a certain condition, that treatment by itself suggests that the group of people with that condition is viewed as socially distinct, because they have been singled out for mistreatment. The panel observed that the record established that Salvadoran society stigmatizes those with mental illness as "locos," and that individuals with intellectual disabilities suffer abuse, neglect, and lack of services, and are periodically targeted and killed. The panel explained that this evidence of harassment and discrimination is an important factor in the determination of whether the group is sufficiently distinct in the society in question to establish a cognizable particular social group.

Because the Board's rejection of Acevedo's alternative proposed social group comprised of "indigent El Salvadoran men, lacking familial support, suffering from severe mental disabilities and exhibiting erratic behavior" was premised entirely on its erroneous rejection of his first proposed group,

the panel concluded that its decision could not stand. Additionally, the panel observed that both the Board and IJ failed to meaningfully engage with the language of the alternative group, and emphasized that the Board and IJ are not free to ignore arguments raised by a party.

The panel held that substantial evidence supported the denial of CAT protection because the record did not a compel a finding that police or medical workers at the National Public Hospital have the requisite specific intent to torture individuals with intellectual disabilities.

## COUNSEL

Keuren A. Parra Moreno (argued) and Jared Renteria (argued), Certified Law Students; Evangeline G. Abriel (argued), Supervising Counsel; Santa Clara University School of Law, Santa Clara, California; for Petitioner.

Maarja T. Luhtaru (argued), Trial Attorney; Keith I. McManus, Assistant Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

CLIFTON, Circuit Judge:

Petitioner Wilber Agustin Acevedo Granados ("Acevedo"), a native of El Salvador, petitions for review of the decision by the Board of Immigration Appeals ("BIA")

affirming an order of removal and the denial by the Immigration Judge ("IJ") of Acevedo's application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Acevedo's petition is based on his fear that, if returned to El Salvador, he would face persecution or torture on account of his membership in a particular social group, defined based on his intellectual disability. The BIA rejected Acevedo's claims on the ground that the proposed group definition was not cognizable. The BIA held that Acevedo's proposed social group was not sufficiently particular, finding that the terms "intellectual disability" and "erratic behavior" rendered the proposed group "amorphous, overbroad, diffuse, [and] subjective." The BIA further determined that the group was not a "meaningful social unit, distinct from the larger population of mentally ill individuals" in El Salvador.

We conclude that the agency misunderstood Acevedo's proposed social group, and thus grant the petition for review with respect to the claims for asylum and withholding of removal. The BIA and IJ treated the term "intellectual disability" as if it were applied by a layperson. Instead, that term as used in Acevedo's application referred to an explicit medical diagnosis with several specific characteristics. Recognized that way, the clinical term "intellectual disability" may satisfy the "particularity" and "social distinction" requirements necessary to qualify for asylum and withholding of removal. However, because the IJ did not recognize the proposed social group before her, we remand to the agency for fact-finding on an open record to determine if the group is cognizable.

As for the claim for CAT relief, however, we deny the petition. The denial of CAT relief by the agency was supported by substantial evidence.

## I. Background

Acevedo is a native of El Salvador, born on July 25, 1988, currently 32 years old. In 1989, his mother, Maria Granados Flores ("Granados"), came to the United States because she was afraid she would be targeted by guerillas as a result of her husband's employment with the Salvadoran military police. Acevedo was left in the care of his father and grandmother in El Salvador. When Acevedo was four or five years old, his father was killed by the guerillas. Thereafter, he remained under the care of his grandmother until 2006 or 2007, when he came to this country to be with his mother in Los Angeles.

Granados testified that, when Acevedo was an infant, doctors in El Salvador told her that he was "fine" and "normal." After he came to the United States, though, she began noticing things that caused her concern regarding his mental health. For example, she "would always see him . . . talk to himself, [and] laugh by himself." Granados testified that, on several occasions, Acevedo's mental health caused altercations leading to multiple arrests, though none led to convictions.

It appears that the last of those arrests occurred in July 2017, when police arrested Acevedo and his brother Henry after a dispute with another brother, Rene. During the altercation, Acevedo allegedly attempted to stab Rene with a pocket knife. Acevedo was charged with exhibiting a deadly weapon, vandalism, and resisting arrest. During the state

court proceedings related to these charges, a doubt was raised regarding Acevedo's competency to stand trial, and Acevedo was referred to Dr. Timothy D. Collister, Ph.D., for a competency evaluation. Dr. Collister reportedly questioned Acevedo's ability to stand trial, but before the state court held a hearing to determine Acevedo's competency, he was taken into custody by the Government in connection with removal proceedings.

The Department of Homeland Security commenced removal proceedings against Acevedo in 2018. At an initial calendar hearing, at which Acevedo appeared without a lawyer, Immigration Judge James M. Left formed a doubt as to whether Acevedo was capable of representing himself in further proceedings. He assigned the case to a different Immigration Judge, Amy T. Lee (referred to throughout as the "IJ") to see if Acevedo needed assistance.

Acevedo appeared again the following week at a hearing before the new IJ. At that time, he recalled the previous hearing, but he did not appear to know why the hearing had been rescheduled or, more generally, appear to understand what was going on, why he was arrested, or what an attorney does. The IJ set a date for a hearing on Acevedo's competency and instructed the Government to schedule an additional examination of Acevedo's mental status.

When he appeared again before the IJ about a month later, Acevedo again could not explain who detained him, why they detained him, or the type of facility at which he was detained. The IJ observed that he "simply does not appear to have much awareness of what is happening." She ordered a forensic competency evaluation by a court ordered psychologist.

Upon receipt of the requested evaluations, on April 23, 2018, the IJ found that Acevedo was "not competent to represent himself" and directed the appointment of a qualified representative.

Both the agency's psychological evaluation, conducted by Wendy Ng, Psy.D., and the court-ordered clinical forensic evaluation, conducted by Jasmine Tehrani, Ph.D., diagnosed Acevedo with an Intellectual Disability, as defined in the Diagnostic and Statistical Manual of Medical Disorders ("DSM-5").[1] The DSM-5 defines Intellectual Disability as a developmental disorder marked by deficits in intellectual functioning and in adaptive skills related to everyday tasks. Both psychological evaluations spoke to the satisfaction of the DSM-5's criteria for an Intellectual Disability.

Dr. Ng provided an overview of the documented history of Acevedo's significant sub-average intellectual functioning, including his low education attainment and his difficulty reading, writing, doing math, and understanding time. She also detailed some of the results of the assessment by Dr. Collister done in connection with the criminal case described above. That assessment estimated Acevedo's intellectual functioning as equivalent to a seven-year-old child and his academic skill development at a kindergarten level. She found that Dr. Collister's determinations were

---

[1] The DSM is a handbook published by the American Psychiatric Association, used by health care professionals all over the world as an authoritative guide to the diagnosis of mental disorders. It has been periodically revised since it was first published in 1952. The latest version, DSM-5 (sometimes termed DSM-V), was published in 2013, after a fourteen-year revision process, and reflects the latest medical understandings of mental disorders. *See generally* www.psychiatry.org/psychiatrists/practice/dsm.

"consistent with [Acevedo's] general mental abilities observed throughout [her] evaluation." Finally, Dr. Ng assessed that Acevedo's Intellectual Disability "significantly impairs his receptive and expressive communication skills, thereby affecting his ability to converse in a coherent, accurate, and effective manner" and making it difficult for him to "understand[] the meaning of information being given to him, including basic questions, phrases, sentences, and descriptive information." As such, Dr. Ng concluded that "[a] supportive family environment will be essential to provide assistance for activities of daily living."

Similarly, Dr. Tehrani stated that Acevedo had an Intellectual Disability, and concluded that "the nature and severity of [Acevedo's] mental illness is such that he cannot provide coherent or relevant information. His thought processes are simplistic, concrete; his short-term memory is poor." Although multiple evaluations indicated that Acevedo appeared to be "responding to internal stimuli," Dr. Tehrani did not reach a specific psychosis diagnosis because Acevedo denied auditory or visual hallucinations at the time of interview.

Both of these evaluations were consistent with four psychological and psychiatric assessments conducted by agency staff while Acevedo was detained at the Adelanto Detention Facility. Each concluded that Acevedo was developmentally disabled with an apparent Intellectual Disability, and "appear[ed] to be 'faking good'" in stating that he understood when he did not.

With the help of a court-appointed lawyer, Acevedo filed an application for asylum, withholding of removal, and protection under the CAT. 8 U.S.C. §§ 1158(b)(1)(A),

1231(b)(3)(A); 8 C.F.R. § 208.16. Acevedo's application was based on his fear that, if returned to El Salvador, he would face persecution or torture on account of his membership in a particular social group, which he defined as "El Salvadoran men with intellectual disabilities who exhibit erratic behavior," or in the alternative, "indigent El Salvadoran men, lacking familial support, suffering from severe mental disabilities and exhibiting bizarre behavior."

Dr. Samuel Nickels, Ph.D., an expert witness on relevant country conditions in El Salvador, testified in support of Acevedo's application. Dr. Nickels explained that access to mental health providers and medications in El Salvador is limited, and homeless individuals with severe mental illnesses who are unable to survive on the streets are often admitted to an inpatient program at the National Public Hospital. There, electroconvulsive therapy is a "frontline treatment" and doctors do not always administer anesthesia prior to the procedure, nor do they always ask patients for consent. Finally, Dr. Nickels testified that family support is critical for individuals with mental illness in El Salvador. Without family support, mentally disabled individuals are likely to become indigent and homeless, be abused in the streets, and may be killed or die an early death due to health challenges.

There was evidence in the record that Acevedo had no family in El Salvador who could take care of him. Granados testified regarding the remaining family members in El Salvador that Acevedo's aunt cared for his grandmother, who is eighty years old, and that neither were able to care for Acevedo, although she asked them. She did not know anywhere else in El Salvador that he could go to live.

Following the denial by the BIA of Acevedo's appeal of the order of removal, Acevedo filed with this court a timely petition for review. We have jurisdiction under 8 U.S.C. § 1252.

## II. Asylum and Withholding of Removal

We first consider the BIA's denial of Acevedo's asylum and withholding claims, reviewing *de novo* questions of law, except to the extent that deference is owed to the agency's reasonable interpretations of its governing statutes and regulations. *See Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1293 (9th Cir. 2018). Findings of fact are reviewed for substantial evidence. *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019).

An alien may qualify for asylum, 8 U.S.C. § 1158(b)(1), if he is unable or unwilling to return to his country "because of . . . a well-founded fear of persecution on account of . . . membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). Similarly, he may qualify for withholding of removal under 8 U.S.C. § 1231(b)(3) if he shows that his "life or freedom would be threatened . . . because of the alien's . . . membership in a particular social group."

When a petition for asylum or withholding of removal is based on membership in a particular social group, the applicant must establish that the proposed group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Rios v. Lynch*, 807 F.3d 1123, 1127-28 (9th Cir. 2015) (quoting *Matter of M-E-V-G*, 26 I. & N. Dec. 227, 237 (BIA 2014)).

The BIA affirmed the IJ's determination that Acevedo's proposed group of "El Salvadoran men with intellectual disabilities who exhibit erratic behavior" was not legally cognizable because the proposed group was not sufficiently particular or socially distinct. Although the BIA recognized that the IJ had not considered the alternative definition offered by Acevedo, "indigent El Salvadoran men, lacking familial support, suffering from severe mental disabilities and exhibiting erratic behavior," it concluded that the alternative was not cognizable as a particular social group either, because that group was "largely encompassed by the social group specifically considered by the Immigration Judge."

### A. Particularity

To satisfy the particularity element, a proposed group must be "defined by characteristics that provide a clear benchmark for determining who falls within the group." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 239-40. In other words, the group must be "discrete" and have "definable boundaries." *Id*. at 239.

In denying Acevedo's asylum claim, the BIA reasoned that the proposed group was not sufficiently particular because the "imprecise contours of the [terms] 'intellectual disability' and 'erratic behavior' renders the proposed group 'amorphous, overbroad, diffuse, [and] subjective,'" citing *Matter of W-G-R-*, 26 I. & N. Dec. 208, 214 (BIA 2014). The BIA further explained that "[t]he group could include individuals with vastly different intellectual disabilities as well as diverse behavioral manifestations."

We appreciate that the term "mental illness" may cover a broad range of disorders of varying severity, and may, on its

own, lack particularity because of its breadth. We also recognize that the term "intellectual disability" can be used, especially by laypersons, in a way that lacks precision. The BIA's assessment here was not based on the evidence in the record regarding Acevedo, however. Acevedo was diagnosed with "intellectual disability" as that term is used within the psychological profession. The particular social group that he proposed did not encompass all mental illnesses and was not based on a lay description but was limited to individuals with a specific diagnosis of "intellectual disability," as defined by the DSM-5.

Intellectual disability, formerly known as "mental retardation," is a commonly recognized mental illness for which the DSM-5 details a well-established medical definition providing several universal, specific, immutable characteristics.[2], [3] These characteristics provide a clear

---

[2] The DSM-5 diagnosis of intellectual disability requires the satisfaction of three criteria: (1) Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing; (2) Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community; and (3) Onset of intellectual and adaptive deficits during the developmental period. DSM-5, 318.0.

[3] "Intellectual Disability" is a listed "mental disorder" under the DSM-5 handbook. It is unclear from the handbook whether an "Intellectual Disability" is also a "mental illness." However, the medical professionals used the term "mental illness" in describing Acevedo's condition. Thus, we similarly use the term.

benchmark from which professional psychologists can determine who falls within the group.

The BIA erred in affirming the IJ's particularity decision because its reasoning assumed that a determination of mental illness was a subjective one, to be carried out by a judge. Indeed, the IJ explicitly refused to "make the subjective determination as to what diagnoses might constitute 'intellectual disability'" and decided that Acevedo did not display "erratic behavior," because the IJ only witnessed "nervous smiling and laughter" in the courtroom, which the IJ did not consider "'out of the ordinary,' let alone 'erratic.'"

However, the particularity standard does not expect that immigration judges make independent diagnoses based on their observations in the courtroom. The record in this case contained evaluations conducted by recognized psychologists, retained by the government, who reported their findings in professional terms. Those evaluations, all of which diagnosed Acevedo with an intellectual disability, were not challenged below. Like finders of fact generally, the IJ was not required to accede to these expert opinions, but she was not entitled to disregard the terms of the psychologists' diagnosis.

The fact that the average layperson may not be able to accurately identify an individual with an Intellectual Disability does not make the clinical definition subjective or amorphous. Similarly, the possibility that individuals within the group may have sub-diagnoses or concurrent diagnoses does not make the group overbroad.

Mental illness may be difficult to recognize, but that does not disqualify it from satisfying the requirements for a particular social group. The fact that the IJ was unable to

detect or assess the extent of Acevedo's intellectual disability was not enough to justify disregard of the evidence in the record that documented clinical diagnoses by licensed professionals.

### B.  Social Distinction

To meet the "social distinction" requirement, the proposed social group must be recognized as a group or "faction" within the relevant society. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238. The criteria asks whether the proposed group is perceived by the society in question to be "sufficiently separate" from the rest of the society. *Id*. at 241.

Here, the IJ misunderstood the proposed social group, and thus did not make the findings of fact necessary to determine whether the group met the social distinction requirement.

The BIA's social distinction analysis was independently flawed in two ways.

First, the BIA committed a legal error in holding that the proposed group did not meet the social distinction requirement because the record does "not support the determination that El Salvadoran society in general perceives [the proposed group] to be a meaningful social unit, distinct from the larger population of mentally ill individuals." The social distinction inquiry asks whether the "society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group," *Pirir-Boc v. Holder*, 750 F.3d 1077, 1082 n.4 (9th Cir. 2014), not whether the group is sufficiently distinguishable from other, similarly-persecuted groups, or whether the individual is a part of one group to the exclusion of other groups. The possibility that

individuals with intellectual disabilities are subsumed in a larger group of persecuted individuals with mental illnesses does not control the social distinction analysis, because the question is whether individuals with intellectual disabilities are singled out for greater persecution than the general population.

Second, the BIA erred in holding that "the fact that individuals with certain illnesses or disabilities may face discrimination or harassment if exhibiting outward symptoms or behavioral manifestations of those conditions does not establish that the respondent's particular social group is socially distinct." That conclusion seems inconsistent on its face. If individuals are treated badly because they manifest a certain condition, that treatment by itself suggests that the group of people with that condition is viewed as socially distinct, because they have been singled out for mistreatment. We have repeatedly recognized that "[e]vidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like may establish that a group exists and is perceived as 'distinct' or 'other' in a particular society." *Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) (quoting *M-E-V-G-*, 26 I. & N. Dec. at 241); *Diaz-Torres v. Barr*, 963 F.3d 976, 980–82 (9th Cir. 2020) (same).

Here, the record established that Salvadoran society stigmatizes those with mental illness as "locos," and that individuals with intellectual disabilities suffer abuse, neglect, and lack of services, and are periodically targeted and killed. Together, this evidence of harassment and discrimination is an important factor in the determination of whether the group is sufficiently distinct in the society in question to establish a cognizable particular social group. We thus remand for the

agency to consider the social distinction inquiry in light of the evidence of discrimination and persecution.

## C.  The Alternative Particular Social Group Definition

Acevedo's second proposed particular social group consisted of "indigent El Salvadoran men, lacking familial support, suffering from severe mental disabilities and exhibiting erratic behavior." As noted above, at 13, the IJ did not discuss that proposed social group. As the BIA's rejection of it was entirely premised on its erroneous rejection of his first proposed group as not cognizable, the dismissal of the alternative definition cannot stand on our review of the current petition.

We add, though, that "IJs and the BIA are not free to ignore arguments raised by [a party]." *Sagaydak v. Gonzales*, 405 F.3d 1035, 1040 (9th Cir. 2005). Neither the IJ nor BIA meaningfully engaged with the language of the alternative definition to determine if it satisfied the requisite elements. The IJ did not address the question at all, and the BIA only addressed the issue in a two-sentence footnote, explaining that "the [second] group is largely encompassed by the social group specifically considered by the IJ."

In fact, the alternative definition arguably resolved some of the problems that the BIA and IJ had with the first proposed group. To the extent that the BIA found that the initial group was too broad to be particular, the alternative group offered several new limiting conditions, applying only to those individuals who were "indigent," "lacking familial support," and had mental disabilities characterized as "severe." Likewise, to the extent that "intellectual disability" was too specific to create a group socially distinct in

Salvadoran society, the revised formulation could resolve the issue by using the broader term "mental disabilities" in lieu of "intellectual disabilities."

There may be rare circumstances in which the BIA could properly overlook an IJ's failure to consider a proposed social group, but this is not one of them. On remand, Acevedo's second proposed group must be given proper consideration.

## III.    Convention Against Torture

Acevedo's application for CAT protection was denied because he did not sufficiently establish that Salvadoran officials had the specific intent to torture him and also failed to establish that it was more likely than not that he would be tortured. Under substantial evidence review, the facts in the record do not compel a different conclusion, so we deny that portion of the petition for review. *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019).

To qualify for relief under CAT, an applicant must show that the alleged mistreatment rises to the level of torture. "In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." 8 C.F.R. § 1208.18(a)(5). We have considered a similar claim based on conditions in Mexico's mental health hospitals and concluded that evidence that conditions were squalid did not prove that any Mexican official had the specific intent to inflict suffering upon patients required to establish an entitlement to relief under CAT. *Villegas v. Mukasey*, 523 F.3d 984, 988–90 (9th Cir. 2008). In that case, we held that an applicant must show "that the actor intend the actual consequences of his conduct, as distinguished from the

act that causes these consequences." *Id.* at 989. That standard applies here.

The record does not a compel a finding that police or medical workers at the National Public Hospital have the requisite specific intent to torture individuals with intellectual disabilities. On the contrary, the record indicates that police lack the requisite mental state because, as described by Dr. Nickels, they are mistaking intellectually disabled people for dangerous gang members and seeking to gain their compliance, albeit perhaps through unacceptably brutal tactics. Similarly, the record does not establish that the hospital staff intended to torture. Dr. Nickels testified that the hospital staff is "a very mixed bag," with some "very compassionate workers" but also some "workers who abuse and neglect" patients. There is insufficient evidence to compel a finding that even the "abusive" workers intend to torture those with intellectual disabilities. Rather, there is an equally plausible explanation that the abuse and neglect is a result of the units' occupancy rates, which at one point, were over 800% capacity.

For these reasons, we deny the petition as to the CAT claims.

## IV.    Conclusion

For the foregoing reasons, we grant the petition for review of the asylum and withholding claims and deny the petition for review of the CAT claims. We remand this matter for further fact-finding on an open record, consistent with this opinion.

**PETITION GRANTED IN PART and DENIED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**